**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JANE DOE,<br>Plaintiff,<br>v.<br>THE SIGNATURE BENEFITS PLAN AND THE DISNEY SEVERANCE PAY PLAN,<br>Defendant. | Case No. SA CV 24-2230 DMG (DFMx)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

This matter is before the Court following a half-day bench trial that took place on March 3, 2026. Elizabeth K. Green appeared on behalf of Plaintiff Jane Doe and Michael H. Bernstein appeared on behalf of Defendant, The Signature Benefits Plan and the Disney Severance Pay Plan. This action involves Doe's claim for reimbursement of mental health benefits for her dependent child, S.J., under the Employee Retirement Income Securities Act of 1974 ("ERISA"), 29 U.S.C. section 1132(a)(1)(B). After the parties filed supplemental briefs, the Court took the matter under submission.

Having carefully reviewed and considered the evidence and arguments of counsel presented at trial and in their written submissions, the Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

# I.

# FINDINGS OF FACT[1]

## Relevant Plan Terms

1. The Signature Benefits Plan and the Disney Severance Pay Plan ("the Plan") is an ERISA-governed employee welfare benefit plan, self-funded by The Walt Disney Company ("the Company"). Administrative Record ("AR") 12, 77.[2] The Plan provides that "the Company has full discretion to interpret the terms of the Plan summarized here and in the other health and welfare benefit and Administration sections and to determine [the participant's] eligibility for benefits under the Plan(s)." AR 12.

2. Plaintiff Jane Doe was enrolled in the Consumer Choice option of the Plan, which is self-insured and paid for by general Company assets. AR 81, 452. Doe's minor child, S.J., was a covered dependent under the Consumer Choice option. AR 16, 452. The Consumer Choice option uses the Cigna Open Access Plus ("OAP") Network. AR 107. Cigna Healthcare ("Cigna") is the claims administrator for the Consumer Choice option. AR 82, 108.

3. For all Cigna medical plan options, "[s]ervices must be medically necessary to be covered under the Plan." AR 193, 123. Under the Consumer Choice option, "Cigna determines medical necessity." AR 123. "Medical necessity determinations are made on either a pre-service, concurrent, or post-service basis[.]" AR 193. Furthermore, under the Plan, "procedures for determining medical necessity vary, according to the type of service or benefit requested, and [the participant's] Company-provided medical plan option (if any)." *Id.* "Cigna Healthcare is Cigna's utilization department that reviews Pre-Admission Certification/Continued Stay Review." AR 122–23.

---

[1] To the extent any of the Court's findings of fact may be considered conclusions of law, or vice versa, they are so deemed.

[2] All citations to the AR herein will refer to the Bates number included on the record. [*See* Doc. ## 38-1, 39 (sealed), 40 (sealed), 41 (sealed).] All other citations to the docket will refer to the page number inserted by the CM/ECF system.

4. The Plan provides coverage for "medically necessary" behavioral health treatment, including for professional counseling and outpatient and inpatient behavioral health care. AR 92, 197–199. The Plan defines "behavioral health" as "[a]n area of health care that addresses emotional and mental conditions, including substance abuse, stress, eating disorders and mental health issues." AR 439. "Inpatient and outpatient treatment require preauthorization, within 24 hours, through the claims administrator." AR 197.

5. If services or benefits are deemed not medically necessary, Plan participants "will receive a written description of the adverse determination, and may appeal the determination" using the appeals procedures "described in [the] provider's network participation documents and in the determination notices." AR 193. The notice of an adverse benefit determination includes, *inter alia*, "[t]he specific reason or reasons for the adverse determination," "[r]eferences to the specific Plan provisions on which the determination is based," "[a] description of any additional material or information necessary to perfect the claim," and "[a] description of the Plan's review procedures and the time limits applicable, including a statement of a claimant's rights to bring a civil action under section 502(a) of ERISA following an adverse benefit determination on appeal." AR 195. "In the case of a claim involving urgent care," the notice would also include "a description of the expedited review process applicable to such claim." *Id.*

6. The Plan describes the appeals procedures following the partial or entire denial of a medical claim. *See* AR 207–210. If a claim is denied, partially or entirely, the participant "may make one appeal." AR 207. When a pre-service claim involves "urgent care," the "total period for responding to the expedited appeal will not exceed 72 hours after receipt of the request for appeal." AR 208. If the Plan Administrator denies the appeal, the participant will receive written or electronic notification that includes, *inter alia*, the "specific reason(s) for the denial," "the relevant Plan provisions on which the denial was based," and "a statement that [the participant] may have a right to an External Review of certain types of claims." AR 209.

7. Following exhaustion of the above appeal right, Plan participants "may also request a final independent external review of any Adverse Benefit Determination involving a question of Medical Necessity" relating to a pre-service or post-service claim. AR 209–10. A request for an independent external review must be made in writing within 120 days "after a decision is made upon the second level benefit determination above." *Id.* Upon receiving such a request, "the Plan Administrator will forward the entire record on appeal within ten (10) days, to an independent external review organization (IRO) selected randomly. The IRO will notify [the Plan participant] of its procedures to submit further information." *Id.* The IRO will issue a final decision within 45 days of receiving all necessary information. *Id.* According to the Plan, the "decision of the IRO will be final and binding except that [the Plan participant has] an additional right to appeal the matter to a federal district court with jurisdiction pursuant to Section 503 of ERISA." *Id.*

8. According to the adverse determination letters issued in this case, "Evernorth Behavioral Health, Inc., a licensed utilization review agent, reviews certain health care services for medical necessity for Disney Worldwide Services, Inc." AR 559, 1578. Evernorth Behavioral Health ("EBH") is not mentioned anywhere in the Plan. *See* AR 1–448.

**MCG Behavioral Criteria Guidelines**

9. The MCG Behavioral Criteria Guidelines ("MCG Guidelines"), also known as the Magellan Care Guidelines, are widely accepted in practice for determining whether services are medically necessary. *See R.R. v. Cal. Physicians' Serv.*, No. 24-6337, 2026 WL 207507, at *2 (9th Cir. Jan. 27, 2026) ("It was proper for [the insurer] to use the MCG to interpret medical necessity, as the guidelines are 'nationally recognized' and 'widely used.'" (citation omitted)).

10. Under the MCG Guidelines, admission to a residential treatment center ("RTC") level of care is medically necessary where all of the criteria outlined in the MCG Guidelines are met. AR 1587–88. The criteria include in relevant part:

- "Patient has persistent [t]houghts of suicide or serious [h]arm to self that cannot be adequately monitored or treated at lower level of care as indicated by 1 or more of the following:
    - Necessary child or adolescent behavioral health care (such as required provider or lower level of care) not available or insufficient
    - Conflict in family environment or other inadequacy in patient support system
    - Patient characteristics, such as moderately severe to severely [i]mpaired impulse control, judgment, or insight; moderate to moderately severe [m]ania (child or adolescent) or unreliability
    - Indication or report of significant physical or sexual risky behavior with [i]mpaired impulse control, judgment, or insight that significantly endangers self"
- "Moderately severe psychiatric, behavioral, or other comorbid conditions are appropriate for management at proposed level of care, as indicated by 1 or more of the following:
    - Psychiatric symptoms, including 1 or more of the following:
        - . . .
        - Depressive symptoms (child or adolescent)
        - Anxiety (child or adolescent)
        - . . ."
- "Recommended treatment is necessary, appropriate, and not feasible at lower level of care ([e.g.], less intensive level is unavailable or not suitable for patient condition or history)."
- "Medical or nursing care services to address primary admission diagnosis are available, as indicated by 1 or more of the following:

- No anticipated need for around-the-clock medical or nursing monitoring . . .
- Active (but not around-the-clock) monitoring of patient by staff needed, and medical or nursing care can easily be provided if need arises . . .
- Around-the-clock medical or nursing monitoring needed, but intensive treatment and resources of licensed hospital are not anticipated . . .
- Patient has sufficient ability to respond to respond as planned to individual and group therapeutic interventions.
- . . . ”

*See* AR 1587–88.

**S.J.’s Treatment History**

11. Generally, there are five descending levels of care for treatment of patients with mental illnesses: (1) inpatient care (for medically and psychiatrically unstable patients requiring 24/7 care); (2) residential treatment (for medically stable patients requiring 24/7 care); (3) partial hospitalization (“PHP”) (part-time care at a facility, about six to eight hours per day, five days a week); (4) intensive outpatient (three hour sessions, two to three days a week); and (5) outpatient (one hour therapy sessions). *See Doe v. Blue Cross Blue Shield of Illinois*, 492 F. Supp. 3d 970, 973 (D. Ariz. 2020).

12. S.J. has a history of major depressive disorder, generalized anxiety disorder, suicidal ideation, and past suicide attempts. AR 598–99. Between April 2023 and February 2024, S.J. had three inpatient psychiatric hospitalizations due to suicidal ideation. AR 587, 598, 663, 1135–38.

13. The first inpatient hospitalization occurred in April 2023 when S.J. was 13 years old. AR 721, 1336. S.J. was hospitalized at Children’s Hospital Orange County for 13 days due to suicidal ideation with a plan to overdose using pills. *Id.* Following the hospitalization, S.J. had ongoing daily passive suicidal thoughts and continued to self-

harm daily, "usually by cutting, scratching, [and] pulling hair." AR 721. By August 2023, S.J. continued to have passive suicidal ideation, but he did not have an intent or plan in place. AR 708–09. S.J. also continued to self-harm, using "whatever" he could find, including screws, nails, and blades. AR 711.

14. On September 25, 2023, S.J. was hospitalized for a second time. AR 1336, 587. S.J. was admitted to UCI Health for eight days due to suicidal ideation with a plan to take his life by overdosing and cutting himself. AR 663, 672. S.J. had "notable" cuts on his arms, forehead, and legs. *Id.* According to the treatment provider's note on September 25, 2023, S.J. stated "that he feels like he knows he is going to die and does not see the point. [He] [h]as not even considered a future or things he would want to do because he does not think it is possible. He notes he cannot remember the last time he felt happy." AR 663. During this hospitalization, he attempted suicide by tying a shirt around his neck. AR 1603. After S.J. stabilized and was discharged from the hospital, he received PHP treatment at UCI Health and then ROWI Teen & Parent Wellness Center ("ROWI") in October and November 2023. AR 595.

15. On November 29, 2023, Plaintiff informed EBH that S.J. "is having thoughts of harming self / he has a plan and intent. He's talked about OD [overdose], jumping off a building, hanging himself." AR 1638–39. Plaintiff was looking for a residential treatment facility because S.J. needed a high level of care and without supervision he was still cutting himself. AR 1638. On December 6, 2023, Plaintiff told EBH that she was hoping for S.J. to be admitted to residential treatment at Compass Behavioral Health ("Compass") because of its Dialectical Behavioral Therapy ("DBT") focus and proximity to the family home, which would allow them to engage in family activities during the week while S.J. receives treatment. AR 1649. Compass was an out-of-network healthcare provider. AR 1652. EBH determined that Center for Discovery was an in-network provider with immediate availability for residential treatment. *Id.* Plaintiff expressed frustration to EBH about the distance of the Center for Discovery facility from the family's home and how the distance "would hinder [their] ability to be

physically present for programming and family sessions." AR 1653. Plaintiff also noted that Center for Discovery offered only one to two hours of therapy per week, whereas Compass offered three hours of therapy per week. AR 1660.

16. On January 5, 2024, S.J. was admitted to residential treatment at Center for Discovery after EBH approved the benefits. AR 1664–65. S.J. had frequent outbursts, including crying, screaming, banging his forehead with his fists, throwing remote controls at staff, threatening to kill himself and staff, throwing objects, kicking a table, and saying he would kill anyone who took his stuffed animal away. AR 1668–69. S.J. called the police because staff took a teddy bear away from him due to behavioral issues. AR 1675. S.J. stated "he really wanted to go to the hospital so he could go to a different [residential treatment] program." AR 1668.

17. On January 18, 2024, after 13 days of residential treatment at Center for Discovery, EBH determined continued residential treatment was no longer medically necessary under the MCG guidelines. AR 1675. EBH recommended intensive outpatient treatment ("IOP") as an alternative level of care. *Id.* Plaintiff disagreed with this recommendation "because she thinks [S.J.] needs more" and it "makes no sense to keep moving him around[.]" AR 1686. EBH "discussed potential for stepping him up to PHP if he decompensates." *Id.* S.J. started IOP treatment at Center for Discovery on January 24, 2024 and ended on February 14, 2024. AR 1337–38, 1687.

18. Upon ending IOP treatment at Center for Discovery, S.J. was admitted to inpatient psychiatric hospitalization for the third time on February 15, 2024. AR 1338. S.J. was admitted to UCI Health for 13 days due to worsening thoughts of suicidal ideation with a plan to jump off the second story roof of the Center for Discovery IOP. AR 587–88, 595, 1688. During his initial admission, S.J. admitted that he had a razor hidden in the back of his phone case and was "observed to exhibit inappropriate affect (smiling when talking about self-harm and suicidal thoughts)." AR 588, 610.

19. On February 26, 2024, while S.J. was still hospitalized, Dr. Kelly Cox from ROWI assessed S.J. AR 725. Dr. Cox noted the following:

> "Client is a 13-year-old transgender person female-male. Recommended LOC [level of care] is RTC to stabilize and decrease severe sxs [symptoms] of depression, sxs of anxiety, persistent SI [suicidal ideation] and self-harm, family conflict, and a lack of response to mental health treatment at a lower level of care. Client's SI is high and unpredictable, with little awareness from client. Client is in need of RTC LOC to continue to work on implementing coping strategies and increasing awareness of triggers/warning signs in order to decrease severity of depression, self harm and SI. Client's previous stay in RTC was terminated before client had adequate time to benefit from that LOC. Client's family would benefit from support in learning how to help client better regulate their emotional distress and improve overall personal, academic, social and family functioning. Client is also in need of medication management and more intensive services. Recommended Compass RTC due to their specialty in DBT skills, which client would benefit from due to multiple failed treatments and need for distress tolerance, emotional regulation, interpersonal effectiveness and mindfulness skills."

AR 731.

20. EBH approved benefits for S.J.'s inpatient hospitalization until February 27, 2024. AR 1706. S.J. was discharged from his third hospitalization on February 28, 2024. AR 596. Although S.J. engaged in self-harm on the day of his discharge by "scratching his hand with nails, and rubbing his hand against the bed frame," he "denied suicidal ideation, homicidal ideation, or audio/visual hallucinations." AR 596–97.

21. For post-discharge treatment plans, EBH Medical Director, Dr. Peter Volpe, discussed S.J.'s condition with one of his treating psychiatrists, Dr. Sharon Houk-Syau. AR 1706. Dr. Houk-Syau "agreed with the findings" in the "care manager's clinical summary."[3] *Id.* Dr. Volpe noted that S.J. was "no longer at imminent risk of serious self-harm." *Id.* Dr. Houk-Syau believed S.J. needed a DBT-specific PHP and recommended Compass, which was an out-of-network facility. *Id.* EBH approved an initial 14 days of coverage for PHP level of care at Compass and a network exception

[3] It is unclear from Dr. Volpe's notes what "findings" were included in the "care manager's clinical summary."

since Compass was an out-of-network provider. *Id.* The discharge notes from February 28, 2024 indicated a follow up appointment for the next day and "patient to connect with Compass PHP after discharge." AR 594.

22. On February 29, 2024, S.J. had an outpatient office visit with UCI Health psychiatrist, Dr. Emma Cooper. AR 585. Dr. Cooper wrote S.J. has "ongoing depression and chronic SI without intent/plan following psychiatric hospital discharge." *Id.* She noted S.J. "has a history of rapid decompensation. He is assessed to be at low acute risk of suicide; however, remains at elevated chronic risk." *Id.* Dr. Cooper noted a "[s]trong recommendation for participation in RTC vs. PHP. Patient and family are amenable, [but] participation is currently limited by availability and insurance coverage." *Id.* Although EBH approved PHP level of care by Compass, an out-of-network provider, only RTC level of care was available at this time. AR 583, 1706, 1709. Therefore, S.J. was not immediately admitted to Compass' PHP. AR 1710.

23. Plaintiff called EBH on February 29, 2024 and left a voicemail indicating that "based on Rowi's assessment . . . Compass Behavioral Health was planning to admit [S.J.] to their RES program and they do no [*sic*] have a spot in PHP." AR 1709. Dr. Volpe noted that "PHP appears to be the most appropriate level of care for follow up, not RES." AR 1710. An EBH representative told Plaintiff that "if there are no opening[s] at Compass then other PHP programs should perhaps be looked into." AR 1710.

**<u>Initial Adverse Benefit Determination for Residential Treatment</u>**

24. On March 13, 2024, EBH received a coverage request from Compass for S.J. to be admitted to its RTC program beginning on March 14, 2024. AR 1713–15. In internal notes dated March 13, 2024, Dr. Volpe opined that "based upon available information [S.J.] does not appear to meet MCG criteria for admission to Residential Behavioral Health Level of Care." AR 1714. Dr. Volpe believed S.J. "could continue with treatment interventions at a lower level of care such as [] PHP." *Id.* In another internal note, an EBH representative wrote, "[p]lan had been for [S.J.] to go to PHP at current facility but facility feels he needs RES." AR 1715.

25. On March 19, 2024, EBH sent Plaintiff an Initial Medical Necessity Denial letter, denying the March 13, 2024 coverage request for an in-network exception for residential behavioral health level of care delivered by an out-of-network provider, Compass Behavioral Health. AR 1578–82. The March 19, 2024 denial letter stated, "Evernorth Behavioral Health, Inc., a licensed utilization review agent, reviews certain health care services for medical necessity on behalf of Employer Plan." AR 1578. Dr. Volpe, a "peer reviewer" and board certified psychiatrist, determined the requested services "have been determined to not be medically necessary as based upon [his] review of the available clinical information and the MCG Behavioral Criteria Guidelines[.]" *Id.* The letter further stated, "although it is reported that you are having difficulty with your emotions, you are not at imminent risk of seriously harming yourself, and you have not had thoughts of harming others. Your speech and behavior are not reported to be disordered or disorganized. You are not reported to be having problems accurately perceiving reality, such as seeing or hearing things that are not there. You do not require the 24-hour monitoring and treatment of a residential treatment facility for safe and effective treatment. Less restrictive levels of care are available for your safe and effective treatment." AR 1578–79.

26. Thus, EBH denied coverage for residential treatment from March 14, 2024 forward based on its determination that such treatment was not medically necessary. AR 1578.

**<u>Plaintiff's Expedited Appeal of Medical Necessity Determination</u>**

27. On March 20, 2024, Compass submitted an internal expedited appeal for EBH's initial adverse determination on Plaintiff's behalf. AR 1724.

28. On March 21, 2024, a therapist from Compass, Angel Amaro, and a board-certified psychiatrist from EBH, Dr. Devinalini Misir, conducted a peer review. AR 1727–28. Amaro informed Dr. Misir that the last time S.J. engaged in self-injurious behavior was March 6, 2024 and that S.J. "says that he has no reason to live." *Id.* When Dr. Misir asked if S.J. has active suicidal intent or plans, Amaro said no. *Id.* Amaro read

a letter from S.J.'s psychiatrist that "basically recommends that [S.J.] should be admitted to RES LOC." *Id.* S.J. "rubs his knuckles on a hard surface because he does not have access to sharps." *Id.* Amaro indicated that if S.J. "has access to sharps he will use it [to] cut himself." *Id.* Dr. Misir noted that although S.J. was engaging in self-harm, he "has not needed any medical attention, is not actively suicidal, does not have an intent or plan, is medication compliant, [and] is not hav[ing] any signs or symptoms that needs 24/7 level of nursing monitoring." *Id.*

29. On March 21, 2024, EBH issued a letter denying the expedited appeal and upholding its original decision to deny Residential Behavioral Health Level of Care. AR 559–62. This determination was made by Dr. Misir after "[a]ll the original information in [S.J.'s] file, the information submitted with this request and the terms of [S.J.'s] benefit plan were reviewed." AR 559. Dr. Misir stated, "[b]ased upon my review of the available clinical information and the MCG Behavioral Criteria Guidelines medical necessity is not met for admission and continued stay at Residential Behavioral Health Level of Care[.]" AR 560. Dr. Misir reasoned, "you are not demonstrating impairment in function across multiple settings due to a moderate to severe mental health disorder which requires access to 24 hour psychiatric intervention and nursing monitoring for safe and effective treatment. There are no medical or psychiatric symptoms which are actively interfering with your ability to effectively participate in treatment in less intensive levels of care. Less restrictive levels of care are available for safe and effective treatment." *Id.*

30. The March 21, 2024 letter advised Plaintiff of her right to appeal the decision using the External Review Program. AR 562. The letter noted, "decisions made by the IROs are binding, meaning we must accept it." *Id.*

**<u>S.J.'s Residential Treatment at Compass</u>**

31. On March 22, 2024, Plaintiff advised EBH that S.J. was not currently accessing any services because "no one will help him despite all of these recommendations made by the hospital." AR 1731. When the EBH representative

informed Plaintiff that PHP was the offered alternative, Plaintiff responded that Compass does not have any availability in their PHP. *Id.* The EBH representative "strongly encouraged [Plaintiff] to seek out the PHP program at Alternative Options Counseling Center while the appeal process is occurring." AR 1731–32.

32. On March 28, 2024, S.J. was admitted to Compass Behavioral Health for treatment at the residential level of care. AR 1365. S.J.'s diagnoses at the time were major depressive disorder (recurrent), social anxiety disorder, generalized anxiety disorder, and autism spectrum disorder. *Id.* On March 28, 2024, a risk assessment could not be completed because S.J. "shut down" and "would not provide any further information in risk assessment." AR 1366. The intake notes, dated March 28, 2024, indicated "Suicidal Ideation" as "None." AR 1365–66.

33. During a second intake interview on March 29, 2024, S.J. "expressed current suicidal ideation," for example saying, "if I don't get into OSHA I'm going to kill myself. AR 1343–44. S.J. also expressed ongoing passive suicidal ideation and reported thoughts of "life is too hard" and "I don't want to be here." AR 1343. S.J. "shutdown" again, however, and the interviewer "was unable to obtain any further information." *Id.* The provider noted, "[w]ill continue to assess to determine if [suicidal ideation is] active or passive." AR 1343–44. S.J. reported prior instances of engaging in self-harm. *Id.* For example, the methods he used to engage in self-harm included "scissors, staples, finger nails, [] rub knuckles raw, [] hit head on walls, pulling hair out, rubbing knuckles on surfaces." *Id.* S.J. also reported that around March 5, 2025, he had urges to act on suicidal ideation one to two times a day with methods such as "jumping off the building, slitting wrists, [] hanging self with a rope, and cutting self a bunch." AR 1343.

34. On March 31, 2024, S.J. reported thoughts of self-harm, but no suicidal ideation. AR 1422–23. S.J. engaged in "head-banging" self-harm and therefore had a low level of participation in a group therapy session. AR 1427. He also kicked the wall, threw items, and then walked outside and threw rocks and trash cans. AR 1431.

35. On April 4, 2024, S.J. reported frequent suicidal behaviors and self-harm urges. AR 1514. S.J. "reported that he has engaged in suicidal behavior (urges and gestures, debating, planning) and suicidal ideation on average 2xs daily with an average intensity of 4.5/10." *Id.* He also "reported that he engages in non-suicidal self-injury (i.e., self-harm) behaviors on average 1-4xs daily . . . [and] that he has only engaged in self-harm 1x (head banging) since he's been at [Compass]." *Id.* S.J. "reported that he has the urge to self-harm 10xs a day at an intensity of 10/10." *Id.* On April 4, 2024, S.J.'s psychiatrist, Dr. Nicole Motakef, noted that he has a "moderate risk for immediate and eventual self-harm" and that he "requires highly structured residential treatment with frequent physician oversight that cannot be provided by less intensive outpatient programs." AR 1508.

36. On April 11, 2024, S.J. hit his head against a wall several times as a form of self-harm, and "had slurred speech and headache afterwards." AR 1132. S.J. went to the emergency department to rule out any possible bleeding. *Id.* His work-up was negative and he was cleared to return to Compass. *Id.* S.J. informed the Compass treatment team that "he was happy to see his mother and is glad he self-harmed." *Id.*

37. On April 23, 2024, S.J. "endorsed suicidal and self-harm behaviors on his diary card and refused to discuss them or discuss high risk behaviors." AR 765. S.J. expressed not wanting to be in an RTC anymore and "was not open to discussing strategies to help him work towards discharge." *Id.*

38. On April 26, 2024, S.J. reportedly became upset "when boundaries were being set within the RTC" and ran away from the facility. AR 830. S.J. was returned safely to the RTC. *Id.* Dr. Motakef again noted that S.J. is at "moderate risk for immediate and eventual self-harm" and "requires highly structured residential treatment with frequent physician oversight that cannot be provided by less intensive outpatient programs." *Id.*

39. On May 1, 2024, S.J. reported a decrease in urges to engage in self-harm behaviors and committed to not self-harm. AR 935. On May 4, 2024, S.J. discharged

from residential treatment and stepped down to PHP level of care at Compass. AR 985, 1740. EBH approved an in-network exception for Compass to provide PHP services through May 20, 2024. AR 1741.

**Plaintiff's Request for External Review**

40. On June 18, 2024, Plaintiff requested an independent external review of the March 21, 2024 appeal denial letter. AR 567. Plaintiff provided a detailed letter and enclosures, including UCI Health medical records from May 2023 to May 2024, Compass treatment records, a letter of support from Dr. Elliot Handler at UCI Health, and Plaintiff and her husband. *See* AR 567–575 (June 18, 2024 letter); AR 576–1559 (enclosures).

41. Dr. Handler wrote a letter dated April 5, 2024, providing a detailed summary of S.J.'s treatment history which spanned multiple levels of mental health care, including, "individual therapy, outpatient psychiatry services, intensive outpatient programs, partial hospitalization programs, residential treatment, and acute psychiatric hospitalizations." AR 1353–56. As the supervising attending Child and Adolescent Psychiatrist, Dr. Handler oversaw S.J's outpatient and inpatient treatment at UCI Health. AR 1353. Dr. Handler provided supervision and direct clinical care for S.J. during his September 2023 and February 2024 inpatient hospitalizations. *Id.* Dr. Handler opined that upon S.J.'s discharge from hospitalization on February 28, 2024, it was his "unequivocal recommendation" for S.J. to attend Compass' RTC and receive DBT treatment. *Id.* Based on S.J.'s "constellation of symptoms," Dr. Handler believed DBT treatment was "the intervention that unequivocally has the strongest body of evidence for reducing symptom burden, decreasing suicidal ideation and self-injury, and improving distress tolerance[.]" AR 1355. Dr. Handler further stated that "[g]iven the severity and persistence of [S.J.'s] symptoms as well as the ineffective and repeated attempts at lower levels of care, I can see no reasonable alternative to treatment taking place in a setting other than an RTC." *Id.* Therefore, it was his "strongest professional recommendation

that [S.J.] enroll in and be allowed to complete the full treatment course at the RTC at Compass." *Id.*

**External Review Determination**

42. MCMC Services, LLC ("MCMC") conducted the independent external review. AR 1567. The service under review was "Residential Behavioral Health Level of Care, Child or Adolescent" at Compass for dates of service from March 14, 2024 to May 4, 2024. AR 1568–69.

43. On September 4, 2024, MCMC issued its appeal determination upholding EBH's denial of benefits. AR 1568. The determination was made by an unidentified medical reviewer who is board certified in psychiatry with a subcertification in Child & Adolescent Psychiatry. AR 1571. The reviewer considered "[a]ll records . . . including [the] appeal letter, denial letter, submitted medical records, and the Summary Plan Description." AR 1569.

44. The reviewer determined the requested service "is not medically necessary for RTC or out of network RTC." AR 1569. The reviewer explained that "[t]he goal of every patient is to be managed in the least restrictive setting. This patient has symptoms that are ongoing and chronic. There is no psych or medical instability warranting 24-hour monitoring." AR 1569.

45. The reviewer did not cite the MCG Guidelines in the denial letter. *See* AR 1567–1571. Instead, the reviewer included a definition of medical necessity "[p]er the Summary Plan Description." AR 1569–70. The letter stated:

> "Medically Necessary/Medical Necessity Medically Necessary Covered Services and Supplies are those determined by the Medical Director to be:
>
> - required to diagnose or treat an illness, injury, disease or its symptoms; in accordance with generally accepted standards of medical practice; [NOT MET]
> - clinically appropriate in terms of type, frequency, extent, site and duration; not primarily for the convenience of the patient, [NOT MET]

> - Physician or other health care provider; and rendered in the least intensive setting that is appropriate for the delivery of the services and supplies. [NOT MET]
> - Where applicable, the Medical Director may compare the cost-effectiveness of alternative services, settings or supplies when determining least intensive setting."

46. The description of medical necessity provided in the September 4, 2024 external review denial letter does not appear in the Plan. *See* AR 1–448. The external reviewer also cited two medical journal articles. AR 1570–71. Neither journal article is in the Administrative Record before the Court. The reviewer did not explain how the journal articles supported the denial of benefits. *See* AR 1567–1571.

## II.

## CONCLUSIONS OF LAW

1. The Plan is an employee welfare benefit plan governed by ERISA, which provides the exclusive remedy for Plaintiff's claims. *See* 29 U.S.C. § 1132(a)(1)(B).

2. The Court has subject matter jurisdiction pursuant to ERISA, 29 U.S.C. section 1332(a), and 28 U.S.C. section 1331.

### Standard of Review

3. A district court reviews an administrator's denial of benefits *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1089 (9th Cir. 1999) (*en banc*) (quoting *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). If a plan confers discretionary authority to the administrator, then the standard of review shifts to abuse of discretion. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006). "[F]or a plan to alter the standard of review from the default of de novo to the more lenient abuse of discretion, the plan must unambiguously provide discretion to the administrator." *Id.* (citing *Kearney*, 175 F.3d at 1090). The default presumption is that the administrator has no discretion,

and "the administrator has to show that the plan gives it discretionary authority in order to get any judicial deference to its decision." *Kearney*, 175 F.3d at 1089.

4. "To assess the applicable standard of review, the starting point is the wording of the plan." *Abatie*, 458 F.3d at 962–63. "There are no 'magic' words that conjure up discretion on the part of the plan administrator." *Id.* at 963. The crux is whether the wording of the plan grants the administrator "power to interpret plan terms and to make final benefits determinations." *Id.* Here, the Plan expressly confers "full discretion" to The Walt Disney Company "to interpret the terms of the Plan summarized here . . . and to determine [the participant's] eligibility for benefits under the Plan(s)." AR 12.

5. Under ERISA, a plan administrator/named fiduciary may delegate its fiduciary responsibilities. *Madden v. ITT Long Term Disability Plan for Salaried Emps.*, 914 F.2d 1279, 1283 (9th Cir. 1990). Here, the Plan does not show that The Walt Disney Company delegated its fiduciary responsibilities to Cigna to interpret the terms of the Plan and to make final benefits determinations. Instead, the Plan states that "Cigna administers and processes claims" for the Consumer Choice medical plan, and that "Cigna determines medical necessity." AR 108, 121, 142. "[A] plan will not sufficiently confer discretion sufficient to invoke review for abuse of discretion just because it includes *a* discretionary element." *Sandy v. Reliance Standard Life Ins. Co.*, 222 F.3d 1202, 1204 (9th Cir. 2000). Discretionary authority, as contemplated by *Kearney*, cannot "be inferred simply from the fact, standing alone, that [Cigna] is making benefits decisions for which it must give reasons." *Id.* at 1206. Furthermore, "[m]erely using the word 'determine' in the policy does not insure that the denial of benefits will be reviewed for abuse of discretion." *Newcomb v. Standard Ins. Co.*, 187 F.3d 1004, 1006 (9th Cir. 1999).

6. The Ninth Circuit confronted a situation similar to the instant case in *Dan C. v. Directors Guild of America – Producer Health Plan*, No. 24-3203, 2025 WL 1554927 (9th Cir. June 2, 2025). In *Dan C.*, the plan expressly gave the Board of Trustees

fiduciary discretionary authority to determine eligibility of benefits and construe the terms of the plan. *Id.* at *1. The Board of Trustees did not unambiguously delegate its discretionary authority, however, to the Board's Benefits Committee, which made the final decision at issue. *Id.* Instead, the plan simply delegated the task of "determining claims appeals" to the Benefits Committee. *Id.* The Ninth Circuit determined that this language fell short of the "unambiguous delegation" contemplated by its precedent. *Id.* Similarly, here, none of the Plan's provisions expressly grants Cigna the power to construe the terms of the Plan and make final benefits determinations. Instead, the Plan merely delegates the task of determining medical necessity to Cigna.

7. Moreover, the Plan does not mention EBH—the entity that made the benefit determination—anywhere. *See* AR 1–448. Defendant points to the initial denial letter, which identifies EBH as "a licensed utilization review agent [that] reviews certain health care services for medical necessity for Disney Worldwide Services, Inc.," as evidence of delegation. AR 559. The Ninth Circuit has stated in no uncertain terms, however, that "unless *plan documents* unambiguously say in sum or substance that the Plan Administrator or fiduciary has authority, power, or discretion to determine eligibility or to construe the terms of the Plan, the standard of review will be de novo." *Sandy*, 222 F.2d at 1207 (emphasis added).

8. The Plan does not unambiguously confer discretionary authority on Cigna or EBH. Therefore, the Court reviews denial of S.J.'s benefits and all determinations therein under the *de novo* standard of review.

9. Plaintiff bears the burden of proving her entitlement to benefits under the Plan by a preponderance of the evidence. *See Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010) ("[W]hen the court reviews a plan administrator's decision under the de novo standard of review, the burden of proof is placed on the claimant."); *Shaw v. Life Ins. Co. of N.A.*, 144 F. Supp. 3d 1114, 1123 (C.D. Cal. 2015) ("A plaintiff challenging a benefits decision under 29 U.S.C. § 1132(a)(1)(B) bears the burden of proving entitlement to benefits by a preponderance of the evidence."). "ERISA

is remedial legislation that should be construed liberally to protect participants in employee benefits plans." *Collier v. Lincoln Life Assurance Co. of Bos.*, 53 F.4th 1180, 1185–86 (9th Cir. 2022) (quoting *LeGras v. AETNA Life Ins. Co.*, 786 F.3d 1233, 1236 (9th Cir. 2015)).

10. "When conducting a de novo review of the record, the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established" his or her entitlement to benefits under the Plan. *Muniz*, 623 F.3d at 1295–96. Furthermore, under *de novo* review, the Court "simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits, without reference to whether the administrator operated under a conflict of interest." *Abatie*, 458 F.3d at 963.

**Scope of Review**

11. The Court's review of the administrator's decision is limited to the administrative record. *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 632 (9th Cir. 2009). The "administrative record" consists of "the papers the insurer had when it denied the claim." *Id.* at n.4 (quoting *Kearney*, 175 F.3d at 1086). Courts often consider independent reviews as part of the administrative record. *See S.L. by & through J.L. v. Cross*, 675 F. Supp. 3d 1138, 1152–53 (W.D. Wash. 2023) (considering independent external review as part of administrative record) (collecting cases).

12. The parties agreed upon and submitted a joint Administrative Record, which included documents Plaintiff submitted as part of the external review conducted by MCMC. Although the parties agree that the external review by MCMC is part of the Administrative Record, they dispute whether the Court should consider documents Plaintiff submitted in support of the external review to evaluate whether the Plan administrator correctly or incorrectly denied benefits. The Court ordered supplemental briefing on this point. [*See* Doc. ## 47 ("Plaintiff's Supp. Brief"), 49 ("Defendant's Supp. Brief").] Plaintiff asserts that the external review request and decision are part of the Administrative Record which should be considered by the Court. Plaintiff's Supp.

Brief at 3. Defendant contends the Court is limited to reviewing information that was before EBH at the time of its "final benefits determination" on March 21, 2024, rather than all the information that was before MCMC during the external review. *See* Defendant's Supp. Brief at 4.

13. The Court finds that it is appropriate to review the entire Administrative Record. *See Abatie*, 458 F.3d at 969–70 ("[I]n general, a district court may review only the administrative record when considering whether the plan administrator abused its discretion, but may admit additional evidence on de novo review."). Defendant offers no authority for the proposition that courts should ignore portions of an administrative record that were submitted in connection with an external review explicitly provided for by the Plan. Defendant's citation to *Frost v. Intel Corp.*, 37 F. App'x 295 (9th Cir. 2002), is inapposite. Defendant's Supp. Brief at 3. In *Frost*, the Ninth Circuit concluded that lab tests and MRIs performed "more than a year after the Plan administrator *finally* rejected Frost's claim" were "not part of the administrative record" and could not be relied upon to find an abuse of discretion. *Frost*, 37 F. App'x at 299. Here, Defendant acknowledges that the documents Plaintiff submitted in connection with the external review *are* a part of the Administrative Record. Defendant's Supp. Brief at 2.

14. Furthermore, the Plan explicitly provided for a "final independent external review of any Adverse Benefit Determination involving a question of Medical Necessity." AR 209–10. The Plan stated that the external review determination is "final and binding." *Id.* Indeed, EBH's letter to Plaintiff stated that EBH "must accept" the external reviewer's decision. AR 562. In other words, if MCMC determined that S.J.'s residential treatment was medically necessary, Defendant would have been obligated to provide coverage. Here, MCMC upheld the decision to deny benefits, so Defendant did not alter its decision to deny coverage. It still follows that Defendant's ultimate decision on S.J.'s claim was not final until after Defendant received the external review. *See Alexandra H. v. Oxford Health Ins. Inc. Freedom Access Plan*, 833 F.3d 1299, 1313 (11th Cir. 2016) (applying the same logic to conclude that the external review was part of

the material the insurer considered in making its final decision and therefore was part of the administrative record). Since the external review informed Defendant's ultimate decision to deny benefits, the Court will consider documents submitted in connection with the external review "as a matter of fairness and reasonable expectations."[4] *Id.*

15. Accordingly, the Court will consider all evidence in the Administrative Record, including records submitted to MCMC as part of the external review.

**Plaintiff Has Proven Entitlements to Benefits**

16. Based upon a *de novo* review of the Administrative Record, the Court finds that Plaintiff has proven by a preponderance of the evidence that she is entitled to coverage under the Plan because S.J.'s residential treatment at Compass from March 28, 2024 to May 4, 2024 was medically necessary under the MCG Guidelines.

17. The Court's "task is to determine whether the plan administrator's decision is supported by the record, not to engage in a new determination of whether the claimant is disabled." *Collier*, 53 F.4th at 1182 (9th Cir. 2022). "Accordingly, the [Court] must examine only the rationales the plan administrator relied on in denying benefits and cannot adopt new rationales that the claimant had no opportunity to respond to during the administrative process." *Id.* Thus, the Court focuses "its analysis of medical necessity on the Plan's proffered denial rationale[.]" *See Dan C.*, 2025 WL 1554927, at *2 (concluding district court properly focused its analysis on the contested elements of the plan's definition of "medically necessary").

18. In the initial denial letter dated March 19, 2024, EBH explained that residential treatment was not medically necessary, in part, because S.J. was "not at imminent risk of seriously harming" himself.[5] AR 1578. One of the MCG Guidelines

[4] MCMC arrived at its decision after "[a]ll records were reviewed including [the] appeal letter, denial letter, submitted medical records, and the Summary Plan Description." AR 1569.

[5] Neither the expedited medical necessity denial letter, dated March 21, 2024, nor the external review determination letter, dated September 4, 2024, listed the lack of imminent risk of serious self-harm as one of the reasons for denial of coverage. *See* AR 559–61, 1567–71.

requirements for residential behavioral health level of care for a child/adolescent is that the child/adolescent presents a "danger to self." *See* AR 1587. A child/adolescent may present a "danger to self" where the "[p]atient has persistent [t]houghts of suicide or serious [h]arm to self that cannot be adequately monitored or treated at lower level of care[.]" *Id.* The Court finds that there is ample evidence in the record that at the time of his admission and during his residential treatment, S.J. was a danger to himself because he suffered persistent thoughts of suicide or serious self-harm. On March 29, 2024, S.J. "expressed current suicidal ideation" and reported thoughts of "life is too hard" and "I don't want to be here." AR 1343. On March 31 and April 11, 2024, he engaged in self-injurious behavior by "head-banging." AR 1427. S.J. reported he had urges to self-harm 10 times a day at an intensity of 10/10 and experienced suicidal ideation on average two times a day. AR 1514.

19. The primary MCG Guideline criteria that the parties dispute is whether S.J.'s residential treatment was "necessary, appropriate, and *not feasible at lower level of care*." AR 1588 (emphasis added). In the March 19, 2024 initial denial letter, EBH determined residential treatment was not medically necessary because "[l]ess restrictive levels of care are available for safe and effective treatment." AR 1579. In the March 21, 2024 expedited appeal denial letter, EBH reasoned that, "[t]here are no medical or psychiatric symptoms which are actively interfering with your ability to effectively participate in treatment in less intensive levels of care. Less restrictive levels of care are available for safe and effective treatment." AR 560. Finally, on September 4, 2024, MCMC determined residential treatment was not necessary because "[t]he goal of every patient is to be managed in the least restrictive setting. This patient has symptoms that are ongoing and chronic. There is no psych or medical instability warranting 24-hour monitoring." AR 1569.

20. The Court finds that Plaintiff has proven by a preponderance of the evidence that residential treatment was necessary, appropriate, and not feasible at a lower level of care. The majority of mental health professionals who examined and treated S.J. opined

that residential treatment was the necessary level of care. Dr. Handler, a supervising attending at UCI Health, was personally involved in overseeing S.J.'s psychiatric care since May 2023 and was very familiar with S.J.'s psychiatric history. AR 1353–55. Dr. Handler "provided supervision and direct clinical care" during S.J.'s September 2023 and February 2024 inpatient hospitalizations. AR 1353. Dr. Handler noted that S.J. had "engaged in multiple levels of mental health care including individual therapy, outpatient psychiatry services, intensive outpatient programs, partial hospitalization programs, residential treatment, and acute psychiatric hospitalizations." *Id.* at 1355. Dr. Handler observed that S.J. "continues to demonstrate affective instability, limited emotional vocabulary, dissociations, minimal abilities to tolerate distress or emotionally charged conversation, a limited sense of self/identity, and an extreme sensitivity to interpersonal rejection and/or feelings of abandonment that then lead to intense thoughts of suicide and self-injurious behavior on a nearly daily basis that severely limits their ability to function outside of a highly structured environment[.]" *Id.* Dr. Handler opined that, "[g]iven the severity and persistence of [S.J.'s] symptoms as well as the ineffective and repeated attempts at lower levels of care, [he could] see no reasonable alternative to treatment taking place in a setting other than an RTC." *Id.* Therefore, it was Dr. Handler's "strongest professional recommendation that [S.J.] enroll in and be allowed to complete the full treatment course at the RTC at Compass." *Id.* Dr. Handler recommended that S.J. complete Compass' RTC at the time of discharge from inpatient hospitalization on February 28, 2024, but maintained the same recommendation in March and April 2024. *See* AR 1353 ("At the time of discharge from [inpatient hospitalization] on February 28, 2024, my unequivocal recommendation was for [S.J.] to attend the Compass Behavioral Health RTC.); AR 1724 (internal note dated March 19, 2024 indicating "Dr. Volpe understands and is aware of Dr. Handler['s] recommendation" for RTC level of care); AR 1353–56 (Dr. Handler's letter dated April 5, 2024 indicating his "strongest professional recommendation that [S.J.] enroll in and be allowed to complete the full treatment course at the RTC at Compass."). Dr. Handler opined that S.J.'s "clinical needs require[d] both

the RTC level of care, and *the specific Dialectical Behavioral Therapy (DBT) treatment programming offered by Compass*." AR 1353 (emphasis added). According to Dr. Handler, Compass was the "only local treatment program" that would meet S.J.'s clinical needs. AR at 1355.

21. Other members of S.J.'s treatment team, including Dr. Cooper and Dr. Cox, strongly recommended participation in an RTC, instead of a PHP at the time of his discharge from inpatient hospitalization in late February 2024. AR 585, 731. Dr. Cooper noted S.J. "remains at elevated chronic risk" of suicide, "has a history of rapid decompensation," and therefore made a "[s]trong recommendation for participation in RTC vs PHP." AR 585. Dr. Cox recommended an RTC level of care "to stabilize and decrease severe [symptoms] of depression, [symptoms] of anxiety, persistent [suicidal ideation] and self-harm, family conflict, and a lack of response to mental health treatment at lower level of care." AR 731. Dr. Cox further noted that S.J. is "in need of RTC [level of care] to continue to work on implementing coping strategies and increasing awareness of triggers/warning signs in order to decrease severity of depression, self harm and [suicidal ideation]. [S.J.'s] previous stay in RTC was terminated before [S.J.] had adequate time to benefit from that [level of care]." *Id.*

22. Furthermore, the mental health professionals who examined and treated S.J. during his residential treatment at Compass opined that he was being treated at the necessary level of care. On April 4, 2024, Dr. Nicole Motakef, S.J.'s treating physician at Compass, opined that S.J. "requires highly structured residential treatment with frequent physician oversight that cannot be provided by less intensive outpatient programs." AR 1508. Dr. Motakef arrived at the same conclusion on April 26, 2024, recommending continued residential treatment based on S.J.'s risk for "immediate and eventual self-harm." AR 828–30. Dr. Motakef's conclusions are supported by S.J.'s reports of ongoing and frequent suicidal ideation and self-harm urges that were at an intensity of 10/10, during his RTC stay. AR 1514.

23. In sum, the opinions of S.J.'s treatment providers largely support a conclusion that residential treatment was necessary, appropriate, and not feasible at a lower level of care. "Courts generally give greater weight to doctors who have examined the claimant versus those who only review the file." *Andrew C. v. Oracle Am. Inc. Flexible Benefit Plan*, 474 F. Supp. 3d 1066, 1083 (N.D. Cal. 2020) (collecting cases). Courts have found that this "is especially true in cases involving mental illness where there are no objective imaging or laboratory tests on which diagnoses are based." *Jamie F. v. UnitedHealthcare Ins. Co.*, 474 F. Supp. 3d 1052, 1062 (N.D. Cal. 2020).

24. Defendant points to the fact that three medical reviewers, inclusive of the independent external reviewer, opined that RTC level of care was not necessary. The first two medical reviewers, Dr. Volpe and Dr. Misir, made their determinations on March 19, 2024 and March 21, 2024, respectively. The Court recognizes that in *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003), the Supreme Court held that plan administrators are not required to accord special weight to the opinions of a claimant's treating physician. Nevertheless, plan administrators may not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id*. Under a *de novo* standard of review, the Court "must evaluate the persuasiveness of the conflicting evidence to make its determination." *Andrew C.*, 474 F. Supp. 3d at 1068 (citing *Kearney*, 175 F.3d at 1094–95). The Court finds that EBH's reviewers Dr. Volpe and Dr. Misir's opinions, are entitled to less weight for the following reasons.

25. In the initial denial letter, dated March 19, 2024, Dr. Volpe determined that residential treatment was not medically necessary because "[l]ess restrictive levels of care are available for safe and effective treatment." AR 1578–79.[6] Although not stated in the

---

[6] Dr. Volpe also noted that S.J.'s "speech and behavior are not reported to be disordered or disorganized" and that S.J. was "not reported to be having problems accurately perceiving reality, such as seeing or hearing things that are not there." AR 1579. These symptoms, however, are not required under the MCG Guidelines. *See* AR 1587–88.

denial letter, Dr. Volpe formed his opinion that PHP was the correct level of care based on a peer-to-peer review that he conducted with Dr. Houk-Syau on February 28, 2024, when S.J. was discharged from inpatient hospitalization. AR 1723–24, 1706, 1719. Dr. Volpe's reliance on the peer-to-peer review with Dr. Houk-Syau, conducted several weeks before the medical necessity determination, arbitrarily ignored contrary evidence and opinions.[7] An internal note dated March 19, 2024 indicated that Dr. Volpe was aware of Dr. Handler's recommendation for RTC level of care, AR 1724, but Dr. Volpe concluded that "the next step in the process would be [for Plaintiff] to request an appeal." *Id.* Dr. Volpe did not engage with Dr. Handler's recommendation, despite the fact that Dr. Handler was Dr. Houk-Syau's supervisor and Dr. Handler's recommendation was more recent than his peer-to-peer review with Dr. Houk-Syau. Furthermore, evidence in the record shows that S.J.'s condition changed between February 28, 2024 and March 19, 2024. *See, e.g.,* AR 1727 (notes indicating S.J. engaged in self-injurious behavior on March 6, 2024 by rubbing his knuckles on a hard surface because he does not have access to sharp objects); AR 1343 (notes indicating S.J. experienced suicidal ideation 1-2 times a day, around March 5, 2024, with methods such as jumping off buildings, slitting wrists, hanging self, and cutting self). Therefore, a peer-to-peer review from February 28, 2024 would not be the most reliable basis for denying coverage.[8]

26. In the expedited appeal, Dr. Misir opined that residential treatment was not medically necessary, in part, based on criteria that are not required under the MCG Guidelines. For example, Dr. Misir noted that S.J. was "not demonstrating impairment in function across multiple settings due to a moderate to severe mental health disorder

---

[7] Notably, on February 26, 2024, Dr. Houk-Syau remarked that although the family was considering PHP level of care upon discharge from inpatient hospitalization, they "[c]ould also consider residential treatment in the future." AR 652.

[8] Even if S.J.'s family and treating physicians believed PHP level of care was appropriate at the time of discharge on February 28, 2024, that would not necessarily contradict the request for residential treatment in mid-March because S.J.'s condition had changed.

which requires access to 24 hour psychiatric intervention and nursing monitoring[.]" AR 560. The MCG Guidelines do not require "impairment in function across multiple settings" nor "24 hour psychiatric intervention and nursing monitoring" to qualify for residential treatment. *See* AR 1587–88.[9] Dr. Misir's reliance on criteria that are not required under the MCG Guidelines raises questions as to the reliability of Dr. Misir's conclusions. Dr. Misir concluded residential treatment was not medically necessary despite knowing that S.J. was engaged in self-harm and had stated that "he has no reason to live." AR 1727–28. Dr. Misir was also informed of "a letter from a psychiatrist who is familiar with [S.J.]" that recommended S.J. should be admitted to residential treatment. *Id.* Yet, Dr. Misir did not engage with or discredit the treating physician's recommendation. Furthermore, Dr. Misir did not mention any specific evidence or medical records that he relied upon in his denial letter. In sum, the Court finds Dr. Misir's opinion to be unsupported by the Administrative Record.

27. Lastly, the Court finds MCMC's external reviewer applied the wrong definition of medical necessity and affords the reviewer's decision little weight. The external reviewer cited to a definition of "medical necessity" that is found nowhere in the Administrative Record. AR 1569–70. The external reviewer did not apply the MCG Guidelines and instead concluded that residential treatment was not "medically necessary" because S.J.'s symptoms are "*chronic and ongoing*" and "[t]here is no psych or medical instability warranting 24-hour monitoring." *Id.* (emphasis added). The external reviewer also cited two journal articles, without any explanation as to their direct relevance to S.J.'s claim. AR 1570–71. Moreover, the journal articles are not included in

---

[9] The MCG Guidelines do require a "moderately severe psychiatric" condition. *See* AR 1587. S.J. readily met this requirement as his diagnoses included depressive symptoms and anxiety, and repeated attempts at self-harm. AR 1365. Furthermore, one of the prongs that can be used to satisfy the requirement that "[m]edical or nursing care services to address primary admission diagnosis are available" for admission to an RTC, is that there is "*[n]o anticipated need* for around-the-clock medical or nursing monitoring." *See* AR 1588 (emphasis added). Thus, the fact that S.J. did not need around-the-clock medical or nursing monitoring means that he met one of the criteria for eligibility for an RTC under the MCG Guidelines.

the Administrative Record. The external reviewer did not provide adequate engagement or analysis of the medical records to convince the Court that the MCMC reviewer's opinion should be afforded more weight than S.J.'s treating physicians.

28. The Court concludes that under a *de novo* review of the Administrative Record, Plaintiff has carried her burden of showing by a preponderance of the evidence that S.J.'s residential treatment at Compass from March 28, 2024 to May 4, 2024, was medically necessary under the terms of the Plan.

29. The Court further concludes that Plaintiff is entitled to approval of benefits and reimbursement of out-of-pocket costs for S.J.'s residential treatment at Compass paid pursuant to a single case agreement.[10]

## III.
## CONCLUSION

1. Under a *de novo* standard of review, Plaintiff is entitled to benefits for S.J.'s residential treatment at Compass from March 28, 2024 to May 4, 2024.
2. Plaintiff's motion for judgment is **GRANTED** and Defendant's cross-motion for judgment is **DENIED**.
3. Plaintiff is entitled to prejudgment interest. *See Blanton v. Anzalone*, 760 F.2d 989, 992–93 (9th Cir. 1985).
4. Within seven days of this Order, the parties shall meet and confer to resolve the amount of the unpaid benefits due and submit a proposed judgment consistent with this Order.

---

[10] Defendant did not address Plaintiff's request for a single case agreement (i.e., an in-network exception), *see generally* Doc. ## 38, 42, and therefore concedes the issue. *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011) ("[I]n most circumstances, failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue.").

5. Plaintiff is the prevailing party and may bring a motion for attorneys' fees and costs pursuant to 29 U.S.C. § 1332(g) within 30 days from the date of these Findings of Fact and Conclusions of Law.

**IT IS SO ORDERED.**

DATED: September 17, 2026

DOLLY M. GEE
CHIEF UNITED STATES DISTRICT JUDGE